# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of the 27th day of April, 2006, by and between HAPPY MILL, LLC, a Texas Limited Liability Company having an address at 334 Knight Street, Unit #125, Warwick, Rhode Island 02886 (hereinafter "**Seller**"), and PROJECT & COST MANAGEMENT, a California Corporation having an address at 14524 Delano Street, Suite 200, Van Nuys, California 91411 (hereinafter "**Buyer**").

WITNESSETH THAT:

WHEREAS, Seller desires to sell to Buyer certain improved real property owned located at Knight Street, Rhode Island, along with certain related personal and intangible property; and

WHEREAS, Buyer desires to purchase from Seller such real, personal, and intangible property in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth the parties hereto mutually agree as follows:

1. The Property.

1.1 Description: Subject to the terms and conditions of this Agreement, and for the consideration herein set forth, Seller agrees to sell, assign and transfer, and Buyer agrees to purchase, assume and acquire, all of Seller's right, title and interest in and to the following (collectively, the "**Property**"):

1.1.1 Certain land known as the Pontiac Mill site located at Knight Street, Warwick, Rhode Island, and more specifically described in Exhibit 1.1.1 "Description of the Land". It is agreed that, upon the issuance of a title commitment, a description of the metes and bounds will be agreed by both parties and attached under Exhibit 1.1.1. Until the issuance of such a title commitment the property to be purchased is described per Crossman Engineering, Inc.'s drawing C1 (dated April 4, 2005) as land only condominium units ("Units") and all buildings located thereon more particularly described as:

**Parcel 1** – Land under, associated with and common area land to Units B to N, Q & R, U & V;

**Parcel 2** – Land under, associated with and common area land to Units O & P;

**Parcel 3** – Land under, associated with and common area land to Units T and proposed parking garage S.

**Parcel 4** – Land located on the north side of Knight Street between Miner Street and Central Street identified as "Common Area" (approximately 90,000sf);

1.1.2 The building(s), improvements, structures and fixtures owned by Seller and now situated on the Land (collectively, the "**Improvements**");

1.1.3 All furniture, personal property, machinery, apparatus, and equipment owned by Seller and currently both used in the operation, repair, and maintenance of the Land and the Improvements and situated thereon, excluding, however, those items listed on Exhibit 1.1.3 attached hereto and tangible personal property owned by the Property's management company (collectively, the "**Personal Property**"). The Personal Property to be conveyed is subject to depletions, replacements, and additions in the ordinary course of Seller's business;

1.1.4 All easements, hereditaments, and appurtenances belonging to or inuring to the benefit of Seller and pertaining to the Land, if any, including, without limitation, all right, title and interest of Seller in and to the dam abutting the land and any adjacent streets, alleys or rights-of-way;

1.1.5 Any street or road abutting the Land to the center line thereof (to the extent owned by Seller);

1.1.6 All leases, licenses, concessions or other occupancy agreements in effect on the date of this Agreement and which are identified on the Schedule of Leases attached hereto as Exhibit 1.1.6, including all amendments thereto, which as of the Closing (as hereinafter defined) affect all or any portion of the Land or the Improvements (all such leases, licenses, concessions or other occupancy agreements being referred to herein, collectively, as the "**Leases**"), and any security deposits actually held by Seller with respect to any such Leases;

1.1.7 All service, maintenance, supply, or other contracts or equipment leases relating to the operation of the Property in effect on the date of this Agreement which are identified on the Schedule of Contracts attached hereto as Exhibit 1.1.7, and any new contracts or equipment leases entered after the date of this Agreement (collectively, the "**Contracts**");

1.1.8 All transferable consents, authorizations, variances or waivers, licenses, permits, abatements, development rights, entitlements and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau, or other entity or instrumentality solely in respect of the Land or the Improvements (including, without limitation, the Project Approvals (as hereinafter defined)) which remain valid or in effect as of Closing and which are transferable at no cost or expense to Seller (collectively, the "**Intangible Property**").

1.1.9 Seller agrees to notify Buyer in the event that the purchase of Parcel A ("NYLO Hotel" site) does not close on time.

1.2 Agreement to Convey. Seller agrees to convey, assign and transfer, and Buyer agrees to accept and assume, on the Date of Closing (as hereinafter defined): (a) title to the Land and the Improvements in the condition herein described, and subject to the Permitted Exceptions (as hereinafter defined); (b) title to the Personal Property, without warranty as to the title or the condition of such personalty; (c) Seller's interest as "landlord" or "lessor" under the Leases; and (e) to the extent Buyer is required, or has elected, to assume the same, the Contracts.

2. Purchase Price. The Property is to be sold to Buyer for the sum of Five Million Seven Hundred Fifty Thousand United States Dollars ($5,750,000) (the "**Purchase Price**"),

which Buyer shall deliver to Seller not later than the Date of Closing by wiring immediately available Federal funds.

3. Deposit. Within three days of the execution of this Agreement by Buyer and Seller, Buyer shall deposit with Pilgrim Title Insurance Company (the "**Title Company**"), the sum of One Hundred Twenty-Five Thousand United States Dollars ($125,000) in immediately available Federal funds by wire transfer pursuant to the Title Company's instructions as a good faith deposit (hereinafter, said deposit and such interest as is earned thereon shall be referred to as the "**Initial Deposit**"), which Initial Deposit shall be held and disposed of in the manner herein provided. The Initial Deposit shall be held by the Title Company until 5pm of the following business day after the Objection Deadline period. If Buyer does not give Termination Notice in accordance with the terms of this agreement, then Initial Deposit shall immediately be released to Seller. If Buyer does not give the Termination Notice (as hereinafter defined) to Seller on or prior to the Approval Date, Buyer shall deposit with the Title Company an additional sum of One Hundred Twenty-Five Thousand United States Dollars ($125,000) in immediately available Federal funds within 7 days (hereinafter, said deposit and such interest as is earned thereon shall be referred to as the "**Additional Deposit**"). The Initial Deposit and the Additional Deposit shall collectively be referred to herein as the "**Deposit**." The Additional Deposit shall immediately be released to Seller. If Closing occurs in accordance with this Agreement, the Deposit shall be applied against the Purchase Price on the Date of Closing. If this Agreement is terminated, or if either party fails to perform any of its agreements hereunder, the Deposit shall be disposed of in the manner hereinafter provided. If any dispute arising under this Agreement with respect to the disposition of the Deposit or the entitlement of any party to the Deposit or the obligations of the Title Company with respect thereto, the Title Company shall not be required to determine the resolution of any such dispute and shall not be obligated to make any delivery of the Deposit. Seller and Buyer hereby jointly and severally agree to indemnify and hold the Title Company harmless from and against any and all loss, costs or damages arising under this Agreement or in connection herewith (except such loss, costs or damages as shall result from the gross negligence or misconduct of the Title Company).

4. Closing. Subject to the provisions of this Agreement, the closing of the transaction contemplated hereby (the "**Closing**") shall occur at 5pm, Rhode Island time on the latter of (i) that date which is thirty (30) days after the Approval Date, or (ii) thirty (30) days after the Approval Date and any extension period, at the Seller's office, unless otherwise agreed upon in writing. At the request of either Seller or Buyer, the Closing may be conducted by mail through an escrow with the Title Company.

5. Buyer's Review.

5.1 Access.

5.1.1 To the extent not previously made available to Buyer, Seller shall promptly upon execution of this Agreement make available to Buyer for copying the Leases and Contracts. Upon Buyer's delivery to Seller of evidence of Buyer's liability insurance in form and substance acceptable to Seller, Seller agrees to allow Buyer or Buyer's agents or

representatives reasonable access to the Property (during business hours) for purposes of any non-intrusive physical or environmental inspection of the Property. Buyer shall not conduct or authorize any physically intrusive testing of, on, or under the Property without first obtaining Seller's written consent as to the timing and scope of work to be performed, which consent may be withheld in Seller's sole discretion. Seller shall further make available to Buyer Seller's books and records relating to the Property (other than any privileged, proprietary or confidential records), including income and expense statements, and, to the extent the same are in Seller's possession, any property management reports, soil reports, environmental studies and reports, surveys, building and systems plans, mechanical, electrical, structural and other engineering reports and studies of the Property, and other matters necessary in the reasonable discretion of Buyer to evaluate and analyze the feasibility of the Property for Buyer's intended use thereof; provided that Buyer hereby acknowledges and agrees that all test results and such other materials shall be kept confidential by Buyer and shall not be disclosed by Buyer.

5.1.2 Buyer shall rely exclusively on its own independent investigation and evaluation of the Property.

5.2 Project Permit and Project Approvals. Buyer shall promptly investigate and use good faith, diligent efforts at Buyer's sole cost and expense to confirm project approvals during the Approval Period.. If Buyer needs to meet, telephone, e-mail or correspond in any way with any government, quasi-government official or consultant, engineer, architect, etc to confirm and/or investigate project matters, then Buyer will provide Seller a minimum of 3 days notice so that Seller may attend.

5.3 Title Commitment. Buyer shall promptly obtain and deliver to Seller a commitment from the Title Company to issue an owner's policy of title insurance insuring the Land and the Improvements (the "**Title Commitment**"), together with copies of all documents evidencing the exceptions to title stated therein.

5.4 Buyer's Right to Object or Terminate.

5.4.1 Buyer's Right to Object. Buyer shall have the right, in its sole discretion, within 45 days of execution of this agreement (the "**Approval Date**"), to make written objection to any matter regarding the Property ("**Objection Notice**"), which notice must specify the cure necessary to remove Buyer's disapproval. Seller shall then have until 5 days after the date of any objection notice (the "**Objection Deadline**") to agree in writing to satisfy Buyer's objections on or before the Date of Closing; Seller shall not be deemed to have any obligation to attempt to cure any such matters unless Seller expressly undertakes such an obligation by a written notice to or written agreement with Buyer given or entered into on or prior to the Objection Deadline and which recites that it is in response to an Objection Notice; provided further, however, notwithstanding anything to the contrary contained in this Agreement, Seller agrees to Remove (as hereinafter defined), and Buyer shall not be required to deliver an Objection Notice with respect to, any mortgages granted by Seller, and any mechanics or materialmens liens arising out of an act or omission of Seller whether existing on the date hereof or at any time prior to Closing (collectively "**Monetary Liens**"). In the event Buyer delivers an Objection Notice and Seller agrees to cure or Remove all of Buyer's objections contained therein, Buyer shall thereafter have no right to terminate this Agreement on account of

such objections after the Approval Date. Buyer's sole right with respect to any objections contained in an Objection Notice given in a timely manner and which Seller has not agreed to cure or Remove, shall be to elect before 5:00 pm Rhode Island time on the business day immediately following the Objection Deadline to terminate this Agreement. All possible objections regarding title, the Survey, or other matters regarding the Property that Seller is not required to cure or Remove pursuant to this Section 5.4.1 and (x) not included in an Objection Notice given by Buyer to Seller on or before the Approval Date, or (y) with respect to which a timely Objection Notice is given but Seller fails to agree to cure or Remove as provided above, shall be deemed to be approved by Buyer as Permitted Exceptions (as hereinafter defined) as provided in Section 5.5 hereof if Buyer does not terminate the Agreement as provided in this Section 5.

For purposes hereof, the term "**Remove**" shall mean to discharge or release of record, bond over or cause the Title Company to insure over, or provide affirmative coverage with respect to, any title matter.

5.4.2 Buyer's Right to Terminate. Buyer shall have the right, in its sole discretion, before 5:00 pm Rhode Island time on the Approval Date (if the Objection Notice has not been given) or 5:00 pm Rhode Island time on the business day immediately following the Objection Deadline (if the Objection Notice has been timely and properly given and Seller has not agreed to cure or Remove all of Buyer's objections), to terminate its obligation to purchase the Property by giving Seller written notice of termination (the "**Termination Notice**"). If the Termination Notice is timely given, (a) Buyer shall promptly return to Seller, at Buyer's sole cost and expense, (i) all of the materials (and copies thereof made by Buyer) made available to Buyer by Seller, (ii) all applications for the Project Approvals and (iii) any other materials used or prepared by Buyer or its consultants in connection with the Project Approvals or otherwise in connection with Buyer's investigation of the Property (including, without limitation, all third-party reports, surveys, plans, studies, investigations and drawings) (the items described in clauses (i), (ii) and (iii) above being referred to herein, collectively, as the "**Due Diligence Materials**"), together with an assignment of the Due Diligence Materials to Seller in form reasonably satisfactory to Seller. Upon Seller's receipt of the foregoing, Seller shall direct the Title Company to promptly return the Deposit to Buyer, neither party shall thereafter have any further obligations or liability hereunder except as expressly set forth in this Agreement. In the event that Buyer does not tender to Seller the Objection Notice or the Termination Notice prior to the Approval Date or the business day immediately following the Objection Deadline, as applicable, the Deposit shall be non-refundable, and Buyer shall have no further rights to the Deposit, and no further right to terminate this Agreement, except pursuant to the relevant sections of this Agreement.

5.5 Permitted Exceptions. If this Agreement is not terminated, Buyer shall be deemed to have approved and to have agreed to purchase the Property subject to the following:

5.5.1 except for Monetary Liens which Seller is required to Remove pursuant to the terms of this Agreement, all matters disclosed in the Title Commitment, all possible title objections, survey objections, and any defects in or to title to the Property or other matters affecting or relating to the title to, or the survey of, or the condition of the Property

existing as of the Approval Date and not included in an Objection Notice given by Buyer and/or which Buyer has otherwise approved or is deemed to have approved;

5.5.2 all existing Leases and all Contracts which Buyer has approved, is deemed to have approved or which Buyer is otherwise required to assume, or which Seller is permitted to enter into, pursuant to the terms of this Agreement;

5.5.3 the lien of non-delinquent real and personal property taxes and assessments for the current fiscal year of the applicable taxing authority in which the Date of Closing occurs, subject to the proration provisions hereof;

5.5.4 rights of parties in possession not shown by the public records;

5.5.5 discrepancies, conflicts in boundary lines, shortages in area, encroachments, and any state of facts which an inspection of the Property would disclose and which are not shown by the public records;

5.5.6 easements or claims of easements, whether or not shown by the public records;

5.5.7 any service, installation, connection, maintenance or construction charges for work performed after Closing, and, subject to the proration provisions hereof, charges for sewer, water, electricity, telephone, cable television or gas; and

5.5.8 liens and other encumbrances created by any act or omission of Buyer or anyone claiming by through or under Buyer or as a result of Buyer's investigations or occupancy of the Property;

5.5.9 condominium documents and related agreements with NYLO Hotels LLC prepared by Seller and presented to Buyer for review during Buyer's forty-five day inspection period;

5.5.10 Settlement Agreement and Covenant Not To Sue between Seller and the State of Rhode Island as currently recorded in the land evidence records for the City of Warwick.

All of the foregoing are referred to herein collectively as the "**Permitted Exceptions**".

5.6 Contracts. Not later than ten (10) business days prior to the Date of Closing, Buyer shall notify Seller in writing as to which of the Contracts Buyer elects not to assume at Closing. Seller shall prepare and send out at Closing terminations of such Contracts; provided that Buyer shall be responsible for the payment under such Contracts during the period after the Closing and prior to the effective termination dates. Notwithstanding anything to the contrary contained in this Agreement, Buyer shall be required to assume the obligations of Seller under any Contracts which are not terminable by Seller without the payment of a termination fee or other expense to the Seller. Buyer acknowledges and accepts that Seller has executed an Easement Agreement with NYLO Hotels, LLC which obligates Buyer to provide parking spaces as more specifically set forth in that Easement Agreement .

6. Condition of Premises.

6.1 Buyer and Seller agree that Buyer is acquiring the Property in its "AS IS" condition, WITH ALL FAULTS, IF ANY, AND WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED, except as expressly provided herein. Except as otherwise expressly set forth in this Agreement, neither Seller nor any agents, representatives, or employees of Seller have made any representations or warranties, direct or indirect, oral or written, express or implied, to Buyer or any agents, representatives, or employees of Buyer with respect to the condition of the Property, its fitness for any particular purpose, or its compliance with any laws, and Buyer is not aware of and does not rely upon any such representation to any other party.

6.2 After its inspections are completed, Buyer shall restore the Property to its condition prior to Buyer's inspections. Buyer agrees to indemnify Seller for all claims or damages arising as a result of any act or omissions of Buyer or its representatives, agents, employees, consultants or contractors relating to Buyer's inspections, including, without limitation, claims for personal injury or property damage, and including all costs and attorneys' fees. The obligations in this Section shall survive the Closing or the termination of this Agreement for any reason.

7. Prior to Closing. Until Closing, Seller or Seller's agents shall:

7.1 Insurance. Buyer acknowledges that Seller currently does not have insurance for the property; and

7.2 Operation. Operate and maintain the Property substantially in accordance with Seller's past practices with respect to the operation of the Property.

8. Representations and Warranties.

8.1 Seller represents and warrants to Buyer as follows:

8.1.1 Organization, Existence, Standing. Seller is a duly organized, validly existing, and in good standing Texas Limited Liability Company, and is qualified to conduct business under the laws of the State of Rhode Island.

8.1.2 Due Authorization. Seller has all requisite power and authority to execute and deliver this Agreement and to carry out its obligations hereunder and the transactions contemplated hereby. This Agreement has been, and the documents contemplated hereby will be, duly executed and delivered by Seller and constitute Seller's legal, valid, and binding obligation enforceable against Seller in accordance with its terms. The consummation by Seller of the sale of the Property is not in violation of or in conflict with, nor does it constitute a default under any term or provision of, the organizational documents of Seller, or any of the terms of any agreement or instrument to which Seller is a party, or by which Seller is bound, or any provision of any applicable law, ordinance, rule, or regulation of any governmental authority or any provision of any applicable order, judgment, or decree of any court, arbitrator, or governmental authority.

8.1.3 Leases. There are no leases in effect with respect to any portion of the Property except as identified in Exhibit 1.1.6.

8.1.4 Contracts. To Seller's Actual Knowledge, there are no Contracts in effect with respect to any portion of the Property except as identified in Exhibit 1.1.7.

8.1.5 Litigation. There are no suits, actions or proceedings pending, or to Seller's Actual Knowledge, threatened in writing, against or affecting Seller or the Property, or any of the transactions provided for herein, before any court or administrative agency or officer, which could reasonably be expected to impair the Seller's ability to perform its obligations under this Agreement.

8.1.6 Condemnation. Seller has not received any written notice of any threatened or contemplated action by any governmental authority or agency having the power of eminent domain which could reasonably be expected to result in any part of the Property being taken by condemnation or conveyed in lieu thereof.

8.2 Buyer represents and warrants to Seller as follows:

8.2.1 Organization, Existence, Standing. Buyer is a corporation, duly organized, validly existing, and in good standing under the laws of the State of California and is qualified to do business in the State of Rhode Island.

8.2.2 Due Authorization. Buyer has all requisite power and authority to execute and deliver this Agreement and to carry out its obligations hereunder and the transactions contemplated hereby. This Agreement has been, and the documents contemplated hereby will be, duly executed and delivered by Buyer and constitute its legal, valid, and binding obligation enforceable against it in accordance with its terms, and the consummation and performance by Buyer of the transactions contemplated herein will not result in a violation of or be in conflict with or constitute a default under any term or provision of the organizational documents of Buyer, or any of the terms or provisions of any agreement or instrument to which it is a party, or by which it is bound, or of any term or provision of any applicable law, ordinance, rule or regulation of any governmental authority or of any term of any applicable order, judgment, or decree of any court, arbitrator, or governmental authority.

8.3 The above-stated representations and warranties will survive the Closing for a period of six (6) months from the Date of Closing before the expiration of which the party claiming a breach must have commenced any action for breach of any representation and warranty in a court of competent jurisdiction, and any representation and warranty not specified in such action shall expire. No such claim or claims for breach of any representation and warranty of Seller in this Agreement, however, shall be actionable unless the valid claims of all such breaches collectively aggregate $10,000. Further, recovery under any such claim shall be limited to actual damages for all such claims (specifically including reasonable attorneys' fees and expenses and court costs) suffered by Buyer, and consequential, punitive, or any other damages shall be taken into account in determining said actual damages. In no event shall the aggregate of such damages exceed $35,000.00. The words "**to Seller's Actual Knowledge**" in

this Agreement and in any closing deliveries provided by Seller shall mean solely to the actual knowledge of Hampton Hodges.

9. Conditions Precedent.

9.1 Representations and Warranties.

9.1.1 Each party's obligation to close hereunder shall be conditioned upon the truth in all material respects as of the Date of Closing of the other party's representations and warranties set forth herein. If on the Date of Closing, a Buyer's representation and warranty is not true in all material respects and such representation and warranty was not true on the date of this Agreement, the Seller may either seek its remedy pursuant to Section 18 hereof, waive this condition and proceed to Closing, or terminate this Agreement by notice to the representing party and Buyer will forfeit all deposit money. If on the Date of Closing a representation and warranty is not true in all material respects, and such representation and warranty was true on the date of this Agreement and has become untrue in any material respect not as a result of a breach of this Agreement by the representing party, subject to Section 9.1.2 below, the other party may either waive this condition and proceed to Closing or terminate this Agreement by notice to the representing party. Upon the representing party's receipt of notice of termination pursuant to this Section 9.1.1, subject to Section 25 of this Agreement, the Deposit shall be refunded to Buyer and this Agreement shall terminate, and neither party shall be liable to the other for damages or otherwise except as otherwise expressly provided in this Agreement.

9.1.2 If on the Date of Closing, a representation and warranty of Seller is not true in all material respects, and such representation and warranty was true in all material respects on the date of this Agreement and has become untrue in any material respect not as a result of a breach of this Agreement by Seller, then at Seller's sole election, Seller may elect to attempt to remedy such materially untrue representation and warranty by delivering written notice thereof to Buyer on or before the Date of Closing, and thereupon the Date of Closing shall be extended to a date specified by Buyer no more than thirty (60) days after the Date of Closing (the "**Seller Extended Closing Date**"). If Seller is unable to so remedy such materially untrue representation and warranty on or prior to the Seller Extended Closing Date, Buyer may either waive such condition and proceed to Closing or terminate this Agreement by written notice thereof to Seller. Upon Seller's receipt of notice of termination pursuant to this Section 9.1.2, subject to Section 25 of this Agreement, the Deposit shall be refunded to Buyer and this Agreement shall terminate, and neither party shall be liable to the other for damages or otherwise except as otherwise expressly provided in this Agreement.

10. Adjustments and Prorations. All taxes, including real estate taxes and personal property taxes, and assessments payable with respect to the current fiscal year of the applicable taxing authority in which the Date of Closing occurs, charges for utilities, including water, sewer, and fuel oil, and for such Contracts for utility services, maintenance services, maintenance and service contracts assumed or required to be assumed by Buyer, all other operating costs and expenses, prepaid insurance and all other income, costs, and charges of every kind which in any manner relate to the operation of the Property shall be prorated to the Date of Closing (such that Buyer will be entitled to all income, and liable for all expenses, of the

Property on such date), except that if Seller does not receive the Purchase Price by receipt of wired funds by 2:00 pm, Rhode Island time, on the Date of Closing, all prorations shall be made as of the following business day. If the amount of said taxes or assessments is not known on the Date of Closing, they shall be apportioned on the basis of the amounts for the preceding year, with a reapportionment as soon as the new amounts can be ascertained. If such taxes and assessments shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless otherwise agreed. Buyer shall be responsible for the payment of any assessments or notice of assessments made after the date of execution hereof for any public improvement or otherwise, provided the Closing occurs. Any deposits on utilities or municipal projects paid by Seller shall be returned or credited to Seller at Closing, provided the Closing occurs. On the Date of Closing, Seller shall deliver to Buyer all inventories of supplies on hand at the Property owned by Seller, if any, at no additional cost to Buyer.

11. Closing Documents.

11.1 Seller's Deliveries. Conditioned upon performance by Buyer hereunder, Seller shall execute and deliver to the Title Company on or before Closing the following documents ("**Seller's Closing Documents**"):

11.1.1 Deed. A [statutory ***quitclaim deed***] conveying title to the Land and the Improvements subject to the Permitted Exceptions, in the form of Exhibit 11.1.1;

11.1.2 Bill of Sale. A bill of sale, assigning and transferring to Buyer all of the right, title, and interest of Seller in and to the Personal Property and Intangible Property, in the form of Exhibit 11.1.2;

11.1.3 Assignment of Leases. (i) Copies of the Leases and (ii) an assignment of the Leases (the "**Assignment of Leases**"), in the form of Exhibit 11.1.3;

11.1.4 Assignment of Contracts. (i) Copies of all Contracts relating to the Property which Buyer has elected, or is required, to assume; and (ii) an assignment of such Contracts (the "**Assignment of Contracts**"), in the form of Exhibit 11.1.4;

11.1.5 Non-Foreign Certificate. A certification that Seller is not a non-resident alien or a foreign corporation, partnership, trust, or estate (as defined in the Internal Revenue Code and Treasury Regulations promulgated thereunder), in the form of Exhibit 11.1.5;

11.1.6 Books and Records. All books and records held by Seller or for the account of Seller relating solely to the Property (other than any privileged, proprietary or confidential records, such as internal appraisals and budgets), including, without limitation, plans and specifications, to the extent in Seller's possession;

11.1.7 Title Insurance Affidavit. A title insurance affidavit and such other similar documents as are reasonably required by the Title Company from Seller as a condition precedent to the issuance of an owner's title insurance policy pursuant to the Title Commitment;

11.1.8 Seller's Authority. Documentation to establish to the reasonable satisfaction of the Title Company and Buyer, the due authorization of Seller's consummation of the transaction and delivery of the Seller's Closing Documents to be delivered by Seller pursuant to this Agreement; and

11.1.9 Closing Statement. A closing statement setting forth the Purchase Price, prorations and costs payable in connection with the transaction (the "**Closing Statement**").

11.1.10 Other Documents. Any other documents required to be delivered at the Closing hereunder, including by the terms of any exhibits hereto.

11.2 Buyer's Deliveries. Conditioned upon performance by Seller hereunder, Buyer shall execute and deliver to the Title Company on or before Closing the following documents ("**Buyer's Closing Documents**"):

11.2.1 Assumption of the Leases. The Assignment of Leases, pursuant to which Buyer shall assume the rights and obligations of "landlord" or "lessor" under the Leases;

11.2.2 Assumption of Contracts. The Assignment of Contracts, pursuant to which Buyer shall assume the Contracts which Buyer has elected or is required to assume;

11.2.3 Closing Statement. The Closing Statement; and

11.2.4 Buyer's Authority. Documentation to establish to the reasonable satisfaction of the Title Company and Seller, the due authorization of Buyer's consummation of the transaction and delivery of the Buyer's Closing Documents to be delivered by Buyer pursuant to this Agreement.

11.2.5 Other Documents. Any other documents required to be delivered at the Closing hereunder, including by the terms of any exhibits hereto.

11.3 Other Closing Documents. Each party shall deliver to the other party or the Title Company such duly executed and acknowledged or verified certificates, affidavits, and other usual closing documents respecting the transactions described herein as the other party or the Title Company may reasonably request.

12. Costs. Buyer shall pay all of the following costs and expenses in connection with the transfer of the Property: Buyer's attorneys' fees; all costs in connection with obtaining the Survey; all costs and expenses in connection with the Project Approvals; any premium for Buyer's owner's policy or Buyer's lender's loan policy of title insurance and any endorsements or extended coverage thereto; all mortgage and intangible taxes or other costs, including recording charges, incurred in connection with any financing of the acquisition by Buyer; and any and all other costs and expenses incidental to or in connection with closing this transaction and incurred by or at the insistence of Buyer. Seller shall pay Seller's attorney's fees, any deed stamps tax or transfer tax, the commission to be paid to the Broker (as defined below) pursuant to the terms of Seller's agreement with the Broker (but only if, as, and when the transaction contemplated hereby is fully consummated and the full consideration therefor has been received

by Seller), and any and all other costs and expenses incidental to or in connection with closing this transaction and incurred by or at the insistence of Seller. Seller shall also pay recording fees for instruments removing liens or other matters that Seller is required to remove.

13. Casualty or Condemnation. In the event that prior to the Date of Closing the Land or the Improvements are damaged or destroyed, in whole or in part, by fire or other cause, or any portion of the Land or the Improvements becomes the subject of a condemnation proceeding by a public or quasi-public authority having the power of eminent domain, then either (a) the parties shall proceed with the transaction contemplated herein, in which event Buyer shall be entitled to receive any insurance proceeds or condemnation awards, or (b) in the event such damage, destruction, or condemnation involves, in the reasonable estimation of Seller, a loss in an amount in excess of $250,000, Buyer, at its option, may terminate this Agreement by notice to Seller within ten (10) days of Buyer's receipt of Seller's notice of such damage or proceeding, in which case, subject to Section 25, the Deposit shall be refunded, and thereafter neither party shall have any further obligation or liability to the other by virtue of this Agreement, except as otherwise expressly provided herein.

14. Insurance. Seller shall in no event be required to assign to Buyer, any fire, hazard, or liability insurance policies which Seller holds respecting the Property.

15. Broker's Commission. Buyer and Seller each hereby warrants and represents to the other that it has dealt with no broker or finder in connection with this transaction. The Seller shall be responsible for paying any Broker commissions pursuant to separate agreement with the Broker, but only if, as and when the Closing occurs and the Seller receives the full Purchase Price. Buyer and Seller each hereby agrees to indemnify and hold the other harmless from and against any and all claims for brokerage or finder's fees or other similar commissions or compensation made by any and all other brokers or finders claiming to have dealt with the indemnifying party in connection with this Agreement or the consummation of the transaction contemplated hereby. The obligations in this Section 15 shall survive the Closing or the termination of this Agreement for any reason.

16. Seller's Performance. The acceptance of Seller's Closing Documents by Buyer shall be deemed to be a full performance and discharge of every agreement and obligation of Seller herein contained and expressed, except such as are, by the terms hereof, to be performed after the delivery of said instruments.

17. Recording Prohibited. This Agreement shall not be recorded in any real property records or other office or place of public record.

18. Remedies.

18.1 If Seller defaults under this Agreement, Buyer's sole and exclusive remedy, at law or in equity, shall be either (a) the return of the Deposit to Buyer, whereupon the obligations of Seller under this Agreement shall terminate; or (b) the right to obtain specific performance of Seller's obligation to convey the Property pursuant to this Agreement; either of which must be exercised within five (5) days of Seller's default; provided that, in no event shall Seller be obliged to undertake any of the following: (i) change the condition of the Property or

restore the same after any fire or casualty; (ii) except as otherwise provided in this Agreement, expend money or post a bond to remove or insure over a title defect or encumbrance or to correct any matter shown on a survey of the Property; (iii) secure any permit, approval, or consent with respect to the Property or Seller's conveyance thereof, except for those required under Sections 8.1.2 and 11.1.8, or (iv) cure defects objected to by Buyer pursuant to Section 5.4.1 hereof, except for those Seller has agreed pursuant to the terms of this Agreement or otherwise in writing to cure. If Seller is unable to convey title to the property as provided for in this agreement Buyer shall no right of specific performance. In no event shall any officer, director, employee, agent, or representative of Seller have any personal liability in connection with this Agreement or transaction.

18.2 If Buyer defaults under this Agreement, Seller, as its sole and exclusive remedy, shall have the right to terminate this Agreement and receive payment of the Deposit, which sum the parties fix and settle as liquidated damages and not as a penalty for such default of Buyer (Seller and Buyer hereby agreeing that in the event of a default by Buyer under this Agreement, Seller's damages would be difficult or impossible to ascertain, and the amount of the Deposit represents a reasonable estimate of such damages), thereby releasing Buyer from this Agreement, except for those provisions contained herein that expressly survive any termination of this Agreement.

18.3 Nothing in this Section 18 shall limit the express provisions of this Agreement obligating one party hereto to indemnify the other or to restore the Property, including, without limitation, pursuant to Section 6.2 hereof.

18.4 In any action to enforce the provisions of this Agreement, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

19. Assignment. Buyer may not assign this Agreement or any of the rights and benefits hereunder without the prior written consent of Seller, and any such attempted assignment shall be null and void. Notwithstanding the foregoing, however, Buyer may assign this Agreement to an entity (i) controlled by Buyer or Principal's of Buyer and (ii) in which Buyer has an ownership interest.

20. Waiver. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

21. Time. It is agreed that time is of the essence of this Agreement.

22. Governing Law. This Agreement shall be construed under the laws of the State of Rhode Island. For the purposes of any suit, action or proceeding involving this Agreement or the transactions which are the subject of this Agreement, each of Buyer and Seller hereby expressly submits to the exclusive jurisdiction of the United States District Court for the District of Rhode Island, and consents that any order, process, notice of motion or other application to or by any such court or a judge thereof may be served within or without such court's jurisdiction by certified mail or by personal service to it or its registered agent, provided that a reasonable time

for appearance is allowed, and each of Buyer and Seller agrees that such court shall have exclusive jurisdiction over any such suit, action or proceeding commenced by either Seller or Buyer. In furtherance of such agreement, each of Buyer and Seller agrees upon the request of the other to discontinue (or agree to the discontinuance of) any such suit, action or proceeding pending in any other jurisdiction. Each of Buyer and Seller hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in the forum described above and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

23. Notices. All notices required or permitted to be given hereunder shall be in writing and sent by overnight delivery service (such as Federal Express), in which case notice shall be deemed given on the day after the date sent, or by personal delivery, in which case notice shall be deemed given on the date received, or by certified mail, return receipt requested, in which case notice shall be deemed given three (3) days after the date sent, or by facsimile transmission with evidence of completed transmission provided that notice so sent by facsimile transmission shall also be sent by either overnight delivery service or personal delivery, in which case notice shall be deemed given on the date sent, to the appropriate address indicated below or at such other place or places as either Buyer or Seller may, from time to time, respectively, designate in a written notice given to the other in the manner described above.

To Seller:

Happy Mill, LLC
334 Knight Street
Warwick, Rhode Island 02886
Attention: Mr. Hampton Hodges
Fax No.: (401) 738-2661
Telephone No.: (401) 738-2621
E-Mail: hamphodges@aol.com

To Buyer:

Project & Cost Management
14524 Delano Street
Suite 200
Van Nuys, California 91411
Attention: Frank Gamwell
Fax No.: (818) 385-0097
Telephone No.: (818) 895-7172
E-Mail: fgamwell@pcmla.com

24. Confidentiality. Buyer shall not disclose the financial and economic terms and conditions of the transaction contemplated herein except as may be required by law or necessary in the ordinary course of its business. All press releases or other dissemination of information to the media, or responses to requests from the media, for information relating to the transaction contemplated herein shall be subject to the prior written approval of the other party prior to the Closing. The obligations in this Section 24 shall survive the Closing or termination of this Agreement for any reason.

25. Return of Due Diligence Materials to Seller. In the event that Buyer is entitled to receive a return of the Deposit pursuant to the terms of this Agreement, the Deposit shall be returned to Buyer only upon Buyer's delivery to Seller, at Buyer's sole cost and expense, of the Due Diligence Materials, together with an assignment thereof to Seller. Upon Seller's receipt of the foregoing, Seller shall direct the Title Company to promptly return the balance of the Deposit to Buyer, and neither party shall thereafter have any further obligations or liability hereunder except as expressly set forth in this Agreement.

26. Tax-Free Exchange.

26.1 Notwithstanding any terms in this Agreement to the contrary, Seller shall have the right to consummate the transaction contemplated by this Agreement in a manner which qualifies as a tax-deferred exchange, in whole or in part, under the provisions of Section 1031 of the Internal Revenue Code, and the Treasury Regulations thereunder (the "**Exchange**").

26.2 Buyer agrees to reasonably cooperate with Seller with respect to the Exchange and to execute such documents as are reasonably requested by Seller in connection therewith, provided that Buyer shall not incur any material costs, expenses or liabilities attributable to the Exchange.

27. Calculation of Time Periods. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event on which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State of Rhode Island, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday or legal holiday. The final day of any such period shall be deemed to end at 5:00 pm, Rhode Island time.

28. Entire Agreement. This instrument sets forth the entire agreement between the parties and may not be canceled, modified, or amended except by a written instrument executed by both Seller and Buyer.

29. Counterparts. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed under seal as of the day and year first above written.

**SELLER:**

**HAPPY MILL, LLC**
a Texas Limited Liability Company

By: [signature]
Name: HAMPTON HODGES
Title: MANAGER

**BUYER:**

**PROJECT & COST MANAGEMENT,**
a California corporation

By: [signature]
Name: ~~FRANK~~ GAMWELL
Title: CEO

**EXHIBITS:**

| | |
|---|---|
| 1.1.1 | Legal Description of Land |
| 1.1.3 | Excluded Personal Property |
| 1.1.6 | Schedule of Leases |
| 1.1.7 | Schedule of Contracts |
| 11.1.1 | Form of Deed |
| 11.1.2 | Form of Bill of Sale |
| 11.1.3 | Form of Assignment of Leases |
| 11.1.4 | Form of Assignment of Contracts |
| 11.1.5 | Form of Non-Foreign Certificate |

# EXHIBIT 1.1.1

## Description of the Land

**EXHIBIT 1.1.3**

Excluded Personal Property

1. Seller will complete this Exhibit and present to Buyer prior to the end of the Objection Deadline period.

**EXHIBIT 1.1.6**

Schedule of Leases

1. Seller states that there are three existing tenant leases for unidentified tenants occupying retail/commercial space. Leases are to be terminated by Seller prior to close. Seller states that leases are month to month.

2. Two existing cell tower leases with Sprint and T-Mobile located on existing water tower (Building R). Buyer will not get an assignment of Seller's rights to the Sprint and T-Mobile leases. Buyer is entitled to an assignment of Seller's interest in the Sprint and T-Mobile leases, subject to Seller's prior grant of rights to these leases to Unison Site Management (RI) LLC. Seller shall assign it's rights in it's agreement with Unison subject to Seller's receipt of payment from Unison, for Seller's assignment of the Sprint and T-Mobile leases. Buyer will retain the rights for all future leases for the water tower property, in accordance with Seller's agreement with Unison

**EXHIBIT 1.1.7**

Schedule of Contracts

1. Buyer acknowledges and assumes all Seller's post-closing obligations to NYLO as set forth in the NYLO Purchase and Sale Agreement, including but not limited to the parking easement agreement and a side-letter agreement. Buyer shall also be obligated to record the draft condominium documents for the property in the form approved by NYLO. Buyer shall, upon closing, also assume all obligations of Seller as Declarant under the Declaration of Condominium and related documents. Buyer shall indemnify Seller from all loss, cost, expense and damages, including legal fees incurred by Seller as a result of Buyer's failure to perform such obligations in an agreement between Buyer and Seller to be delivered at the Closing.

2. As a part of Seller's sale of it's interest in Pontiac Mills, Seller shall assign to Buyer it's interest in an escrow account in the amount of two hundred thousand dollars ($200,000) to be used by Buyer, if Buyer closes, to construct certain surface parking for the benefit of NYLO, and at closing Buyer shall pay Seller an additional two hundred thousand dollars ($200,000) in consideration of this assignment, which assignment shall be delivered at the closing.

# EXHIBIT 11.1.1

## Form of Deed

**EXHIBIT 11.1.2**

Form of Bill of Sale

BILL OF SALE

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, _______________, a ____________________ ("**Seller**"), hereby conveys to ______________________, a ______________("**Buyer**"), all of Seller's right, title and interest in and to all of the Personal Property and Intangible Property.

This Bill of Sale is delivered pursuant to that certain Purchase and Sale Agreement dated _______________, 2006 between Seller and Buyer (the "**Agreement**") and constitutes a Bill of Sale thereunder.

Capitalized, undefined terms in this Bill of Sale shall have the same meaning as in the Agreement.

The Personal Property and the Intangible Property is conveyed "AS IS, WHERE IS" WITH ALL FAULTS, AND WITHOUT ANY WRITTEN OR ORAL REPRESENTATIONS OR WARRANTIES WHATSOEVER EXPRESS, IMPLIED OR ARISING BY OPERATION OF LAW.

Any conflict between the provisions of this Bill of Sale and the Agreement shall be controlled by the provisions of the Agreement, and this Bill of Sale is specifically limited in its recourse by Buyer against Seller by the provisions of the Agreement (including, without limitation, Section 8.3 thereof), and is otherwise subject to the provisions of the Agreement.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed and delivered as of this ____ day of , 200__.

**SELLER:**

**HAPPY MILL, LLC**
a Texas Limited Liability Company

By:____________________________
Name:
Title:

**EXHIBIT 11.1.3**

Form of Assignment of Leases

**ASSIGNMENT AND ASSUMPTION OF LEASES**

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, ____________________, a ____________________ ("**Seller**"), hereby assigns and delegates to ____________________, a ______________("**Buyer**"), and Buyer hereby agrees to assume and accept the assignment and delegation of, all of Seller's right, title and interest in and to all obligations, liabilities, duties, rights and benefits under the Leases, agreements to lease, security deposits and prepaid rents relating to the Land and Improvements thereon known as and more particularly described on Exhibit A attached hereto and made a part hereof accruing or occurring on or after the date hereof, including, without limitation, all causes of action heretofore accrued thereunder. The Leases are listed on Exhibit B attached hereto and made a part hereof.

Seller shall indemnify, defend and hold Buyer harmless against all claims, suits, obligations, liabilities, damages, losses, costs, and expenses, including, without limitation, reasonable attorneys' fees and disbursements, based upon, arising out of, or resulting from Seller's breach of the terms and provisions of the Leases occurring prior to the date hereof except to the extent any of the foregoing relate to the condition of the Property, including, without limitation, the interior, exterior, and structure of all Improvements, and the condition of soils and subsurfaces. Buyer shall indemnify and hold Seller harmless against all claims, suits, obligations, liabilities, damages, losses, costs, and expenses, including, without limitation, reasonable attorneys' fees and disbursements, based upon, arising out of, or resulting from Buyer's breach of the terms and provisions of the Leases occurring on or after the date hereof.

This Assignment and Assumption of Leases is delivered pursuant to that certain Purchase and Sale Agreement dated ______________, 2005 between Seller and Buyer (the "**Agreement**").

Capitalized, undefined terms in this Assignment and Assumption of Leases shall have the same meaning as in the Agreement.

Any conflict between the provisions of this Assignment and Assumption of Leases and the Agreement, shall be controlled by the provisions of the Agreement and this Assignment and Assumption of Leases is specifically limited in its recourse by Buyer against Seller by the provisions of the Agreement, and is otherwise subject to the provisions of the Agreement.

IN WITNESS WHEREOF, Seller and Buyer have executed the Assignment and Assumption of Leases effective as of this _____ day of _________________, 2006.

**SELLER**:

**HAPPY MILL, LLC**
a Texas Limited Liability Company

By:____________________________
Name:
Title:

**BUYER**:

**PROJECT & COST MANAGEMENT**
A California Corporation

By:____________________________
Name:
Title:

Exhibits:

Exhibit A - Legal Description
Exhibit B - Leases

**EXHIBIT 11.1.4**

Form of Assignment of Contracts

**ASSIGNMENT AND ASSUMPTION OF CONTRACTS**

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, _______________, a ___________________ ("**Seller**"), hereby assigns and delegates to a ______________________, a ________________("**Buyer**"), and Buyer hereby assumes and accepts the assignment and delegation of, all of Seller's right, title and interest in and to the Contracts described on Exhibit A attached hereto and made a part hereof relating to the Land and Improvements thereon more particularly described on Exhibit B attached hereto and made a part hereof.

Seller shall indemnify, defend and hold Buyer harmless against all claims, suits, obligations, liabilities, damages, losses, costs, and expenses, including, without limitation, reasonable attorneys' fees and disbursements, based upon, arising out of, or resulting from Seller's breach of the terms and provisions of the Contracts occurring prior to the date hereof except to the extent any of the foregoing relate to the condition of the Property, including, without limitation, the interior, exterior, and structure of all Improvements, and the condition of soils and subsurfaces. Buyer shall indemnify and hold Seller harmless against all claims, suits, obligations, liabilities, damages, losses, costs, and expenses, including, without limitation, reasonable attorneys' fees and disbursements, based upon, arising out of, or resulting from Buyer's breach of the terms and provisions of the Contracts occurring on or after the date hereof.

This Assignment and Assumption of Contracts is delivered pursuant to that certain Purchase and Sale Agreement dated ______________, 2006 between Seller and Buyer (the "**Agreement**").

Capitalized, undefined terms in this Assignment and Assumption of Contracts shall have the same meaning as in the Agreement.

Any conflict between the provisions of this Assignment and Assumption of Contracts and the Agreement shall be controlled by the provisions of the Agreement, and this Assignment and Assumption of Contracts is specifically limited in its recourse by Buyer against Seller by the provisions of the Agreement, and is otherwise subject to the provisions of the Agreement.

IN WITNESS WHEREOF, Seller and Buyer have executed this Assignment and Assumption of Contracts effective as of this ______ day of _______________, 2005.

**SELLER**:

**HAPPY MILL, LLC**
a Texas Limited Liability Company

By:____________________________
Name:
Title:

**BUYER**:

PROJECT & COST MANAGEMENT
a California corporation

By:____________________________
Name:
Title:

EXHIBITS:

Exhibit A - List of Contracts
Exhibit B - Legal Description

**EXHIBIT 11.1.5**

AFFIDAVIT PURSUANT TO FOREIGN

INVESTMENT AND REAL PROPERTY TAX ACT

The undersigned hereby declares that the name, address and United States taxpayer identification number of the owner of the real property described in Exhibit A attached hereto and incorporated herein by reference is as follows:

| Name and Address | I.D. Number |
| --- | --- |
| | ____________________ |

The owner is a limited partnership organized and existing under the laws of the State of Delaware, and as such, is not a foreign citizen or entity.

The undersigned understands that the Buyer of the real property intends to rely on the foregoing representations in connection with the United States Foreign Investment and Real Property Act.

[signatures on the following page]

Dated: _______________, 200__

SELLER:

_________________________________

a _______________________________

By:______________________________
Name:
Title:

EXHIBITS:

Exhibit A - Legal Description